IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SHEREE LINDA MCCUBBIN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 06-4110-CV-C-NKL |
| ) | |
| MICHAEL DALE MCCUBBIN, ) | |
| ) | |
| Respondent. ) | |
| ) | |
| ) | |

ORDER

Pending before the Court is Petitioner Sheree Linda McCubbin's Petition for Return of Children [Doc. # 1]. Sheree McCubbin, a citizen of Australia, filed this action on May 24, 2005, under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq. A hearing on the petition was scheduled for June 22, 2006. At that hearing, Sheree McCubbin, her sister and her de facto brother-in-law gave sworn testimony by telephone from Australia. Respondent Michael McCubbin, a U.S. citizen, appeared and testified in person. Each party also submitted documentary evidence. The Court continued the hearing until June 28 at which time Sheree McCubbin appeared in person and Michael McCubbin appeared with the children. After considering the testimony and other evidence received at the hearings as

1

well as the arguments of the parties, the Court finds that the habitual residence of the McCubbins' children is Australia and that they have been wrongfully retained in the United States. For the following reasons, the Court grants Sheree McCubbin's petition and orders the children returned to her for transportation back to Australia.

**I.     Background**

Sheree McCubbin met Michael McCubbin in her hometown of Townsville, Australia in September 1995 while he was serving in the United States Navy. They married in Australia in October 1996 just before Michael McCubbin was to transfer to San Diego, California. Although they would be moving to the United States after their wedding, the McCubbins planned to return to Australia eventually, a promise they reiterated to each other on their wedding day. Before she left Australia, Sheree McCubbin cashed out her Superannuation fund, a kind of social security fund administered by the Australian government, and made arrangements to cease paying Australian taxes and voting in Australian elections.

Upon moving to San Diego in 1996, the couple lived in rented apartments for two years before buying a house in 1998. During that time, Sheree McCubbin obtained a California driver's license, received training as dental hygienist, and worked as a registered dental assistant until the birth of the McCubbins' first child, Teagan, on April 22, 2000. After Teagan's birth, Sheree McCubbin worked at home as a full-time mother for six months before returning one day a week to the dental office where she had worked previously. Around the same time, Michael McCubbin applied for a two-year personnel

exchange billet that would take the McCubbins back to Australia in exchange for an Australian naval family being stationed in their place in San Diego. In March 2001, the billet was approved. The McCubbins sold their house in San Diego and relocated to Sydney where they rented two houses in two years. They also purchased two parcels of land elsewhere in Australia, one in Townsville on which to build a rental house for extra income, the other in Mundingburra on which to build a home for the family's permanent residence when Michael McCubbin retired from the Navy in 2006. Nevertheless, the couple always intended to return to the United States following the two-year billet: they did not pay taxes in Australia while Michael McCubbin was stationed there, and Sheree McCubbin did not vote in Australian elections. Her application for a permanent U.S. resident visa was approved while they were in Sydney.

In March 2002, midway through the two year exchange, Sheree McCubbin gave birth to the McCubbins' second child, Braiden. The couple reported Braiden's birth to the U.S. government to establish dual citizenship in the United States and Australia. They also established dual citizenship for Teagan by applying for a certificate of extraction from the Australian government.

When the exchange billet ended in March 2003, the Navy transferred Michael McCubbin to Pascagoula, Mississippi, where he was to be stationed aboard the USS Ticonderoga for his final three years in the navy. The McCubbins moved to nearby Ocean Park, Mississippi, in May 2003 and purchased a house. Construction on the rental property in Australia continued in their absence, and was eventually rented to Sheree

McCubbin's mother when completed.  The McCubbins lived in Ocean Park–with Michael McCubbin spending approximately every other month abord his ship–until March 2004 when the USS Ticonderoga was assigned to a six-month deployment on hurricane duty in the Gulf of Mexico.   The McCubbins agreed that Sheree McCubbin would take Teagan and Braiden back to Townsville, Australia, to live in their rental house with Sheree McCubbin's mother.  They sold their house in Mississippi but discussed renting an apartment in Alabama in September for Sheree McCubbin and the children to visit Michael McCubbin after his hurricane duty ended.  Sheree McCubbin enrolled Teagan in preschool in Australia upon their arrival in March 2004.  Teagan attended that preschool regularly through November 2005.  Sheree McCubbin also enrolled Braiden in day care two days per week beginning in September 2004.

After Sheree McCubbin and the children had relocated to Australia, the navy decided to decommission the USS Ticonderoga in October 2004, and Michael McCubbin was obliged to stay aboard an extra month until the ship stood down.  During that seven month deployment, the McCubbins' marriage began to break down.  Although Michael McCubbin made arrangements for a month-to-month apartment lease in Alabama for Sheree McCubbin and the children's return, it became apparent that they were not going to come.  Michael McCubbin flew to Australia to visit his family in October, at which time the McCubbins discussed their marital difficulties and tried counseling.  Michael McCubbin also discussed with Sheree McCubbin's sister and brother-in-law his plans for the family to live together in Australia permanently after his retirement from the Navy.

4

Although Sheree McCubbin was doubtful about their future together, Michael McCubbin returned to the United States with some hope that he could save their marriage.

Michael McCubbin went to Australia again in December 2004 to spend Christmas with his children. He stayed in their house with Sheree McCubbin but slept in a spare bedroom. It was clear by that time that the marriage was over so Michael McCubbin began looking into means of obtaining residence in Australia after his retirement from the navy. After another few months on duty, Michael McCubbin returned to Australia for another visit in March 2005, at which point he and Sheree McCubbin hammered out the financial arrangements for their separation. The children remained with Sheree McCubbin as Michael McCubbin was still on active duty. Although Michael McCubbin sought legal counsel in both the United States and in Australia on the issue of child custody, he did not pursue any legal action concerning his marriage or child custody.

Michael McCubbin was due to retire in November 2005. He and Sheree McCubbin agreed that the children would come celebrate his retirement with him and spend Thanksgiving, Christmas, and New Years with their father. The children were to return to Australia on January 9, 2006, so that Teagan could begin elementary school classes in mid-January. Michael McCubbin intended to return with them in January so he could be with Teagan during her first week of school. Michael McCubbin picked the children up in Australia. Before he left for the United States, he confirmed with Sheree McCubbin's sister and brother-in-law his intentions to return the children to Australia; however, after he and the children reached the United States, Michael McCubbin changed

his mind. He feared that he had no legal means of obtaining permanent residence in Australia outside of his marriage to Sheree McCubbin and decided to keep the children in the United States. On January 8, 2006, the day before he was to return with the children to Australia, Michael McCubbin called Sheree McCubbin and told her his mother was ill and that he couldn't return the children until January 19. Sheree McCubbin was upset but agreed to the delay. During the following week, Michael McCubbin contacted an attorney about pursuing a custody determination in a U.S. court. On January 18, 2006, he called Sheree McCubbin and told her he was not going to return the children to Australia. She objected to his decision to keep them in the United States and demanded their return but Michael McCubbin would not relent. He moved the children to his parents' home in Missouri, enrolled Teagan in public school, and initiated divorce and custody proceedings in Boone County Circuit Court. When Teagan's old school in Townsville, Australia, received a request for Teagan's immunization history by a school in Missouri, Sheree McCubbin contacted a lawyer in the mid-Missouri area and filed the present petition in federal court for the children's return.

## II. Discussion

### A. Hague Convention

The Hague Convention of October 25, 1980, was enacted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Toward those ends, the Convention articulates two objectives: "to secure the prompt

return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (quoting Hague Convention Art. 1). In other words, the Hague Convention seeks "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993).

Congress ratified the Hague Convention on April 29, 1988. *Id.* The following August, Congress passed ICARA to implement the United States' obligations under the Convention by allowing an aggrieved parent to file a petition in state or federal court for the return of her child. 42 U.S.C. § 11603(b). The courts' jurisdiction to hear such petitions does not extend to the merits of a custody determination. *Koch v. Koch*, 2006 U.S. App. LEXIS 14417, 18 (7th Cir. 2006); Hague Convention, Article 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). Rather, the courts' inquiry is limited to deciding which country is the proper forum for custody to be determined. *Koch*, 2006 U.S. App. LEXIS 14417 at 18.

In this action to secure the return her children under ICARA, Sheree McCubbin must prove by a preponderance of the evidence that the children have been wrongfully retained in the United States. *Id.* § 11603(e)(1)(A). A prima facie showing of wrongful retention requires proof that (1) the children were "habitual residents" of the petitioner's

7

country at the time they were retained in the respondent's country, (2) the retention was in breach of the petitioner's "rights of custody," and (3) the petitioner was actually exercising those custody rights at the time of the children's retention and would have continued to exercise them but for the retention. See Hague Convention Art. 3.

"Habitual residence" is not defined in the language of the Hague Convention or by ICARA. The Eighth Circuit has held that "the text of the Convention directs courts to only one point in time in determining habitual residence: the point in time 'immediately before the removal or retention.'" *Silverman*, 338 F.3d at 897-898 (quoting Hague Convention, Art. 3). Additionally, the text of the Convention points to the child's, not the parents', habitual residence. *Id*. at 898. A person may have only one habitual residence, and it should not be confused with domicile. *Id.*; Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 379 (8th Cir. 1995). "The court must focus on the child, not the parents, and examine past experience, not future intentions." *Silverman*, 338 F.3d at 898 (quoting *Nunez-Escudero*, 58 F.3d at 379). "Habitual residence may only be altered by a change in geography and passage of time." *Id.*

### B. Analysis of Sheree McCubbin's Prima Facie Case

The petition before the Court does not present a close case. There is no dispute that Sheree McCubbin was exercising rights of custody over Teagan and Braiden when they came to the United States to visit Michael McCubbin in December 2005. The only substantial issue is whether Australia was their country of habitual residence immediately before their visit. The Court concludes that it was.

8

The McCubbins always intended to raise their children in Australia, buying property there on which eventually to build their family home. Although both children have dual citizenship and have lived some fraction of their lives in the United States, both Teagan and Braiden have lived in Townsville, Australia, since March 2004. Teagan has attended school in Australia since that time, and Braiden has attended day care there for over a year. The decision to move to Australia from Mississippi was made jointly by Sheree McCubbin and Michael McCubbin when he was ordered to sea for six months in early 2004. Michael McCubbin claims that he thought Sheree McCubbin and the children would return to live with him in the United States in September 2004 when his deployment ended. Sheree McCubbin claims that they only planned to visit Michael McCubbin in the U.S. in September and had agreed in March that the children would live with her in Australia until Michael McCubbin could join them permanently when he retired in 2006.

In any event, the children remained in Australia from March 2004 through November 2005. At no time did Michael McCubbin demand the children's return to the United States or petition the Australian government for their return under the Hague Convention. On the contrary, Michael McCubbin went to visit them in Australia on three occasions, paid for Teagan's schooling in Australia, and even investigated ways that he could live there after his retirement. He did contact Australian and American lawyers in 2005 to discuss getting a custody determination but ultimately chose not to pursue the matter until he retired. Meanwhile, the children had become acclimated to Australia.

9

Teagan finished her preschool and Sheree McCubbin made arrangements for her to begin elementary school in January 2006. Braiden attended a local day care two days per week. Both children made friends in the community and spent substantial time with family members.

As Michael McCubbin's retirement date approached, he and Sheree McCubbin agreed that the children would come to the United States for his retirement ceremony and stay through the Thanksgiving, Christmas, and New Years holidays. During the hearing, Michael McCubbin initially denied that this trip was only a "holiday visit," but he eventually conceded that it had been his and Sheree McCubbin's intention that the children would return in January so that Teagan could start her new school. Michael McCubbin had even made plans to return to Australia with the children for Teagan's first week of school. Only after they reached the United States did Michael McCubbin have a change of heart. There is no credible argument that the children's habitual residence is anywhere but Australia. Sheree McCubbin has satisfied her burden to show that Teagan and Braiden have been wrongfully retained in the United States in violation of rights of custody which she had been and would have continued to exercise in Australia but for the retention.

### C. Affirmative Defenses

The ICARA and the Hague Convention set forth several affirmative defenses which may be grounds for denying a petition. The only such defense raised in the present case comes from Article 20 of the Hague Convention, which provides, "The return of the

child under the provision of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Michael McCubbin contends that the principles expressed in the Servicemembers Civil Relief Act, 50 U.S.C. § 501 et seq., would be offended if Sheree McCubbin were able to establish the children's habitual residence in Australia while he was away at sea. He bears the burden of proving this Article 20 affirmative defense by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

> The purpose of the Servicemembers Civil Relief Act is to
>
> (1) to provide for, strengthen, and expedite the national defense through protection extended by this Act to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation; and (2) to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service.

50 U.S.C. Appx. § 502. Michael McCubbin concedes that the Relief Act does not expressly prevent the Court from granting Sheree McCubbin's petition. Rather, he argues that the Relief Act is a "fundamental principle of [the United States] relating to the protection of human rights and fundamental freedoms." Essentially, Michael McCubbin contends that he was unable to seek the return of his children to the United States while he was still in the navy because he was constantly deployed at sea. Since a civil suit could not be maintained against him in his absence, and any statute of limitations for his claims would be tolled during his deployment, Michael McCubbin argues that any period

11

of time used to establish the children's habitual residence in Australia should also be ignored while he was deployed.

Even assuming that the Relief Act were the sort of "fundamental principles . . . relating to the protection of human rights and fundamental freedoms" contemplated by the Hague Convention, Michael McCubbin has not offered even a preponderance of evidence–much less clear and convincing evidence–that the return of the children in the present case would violate those principles. The custody of the McCubbins children is not at issue in this action. The Court is merely deciding which forum should determine custody. The Court concludes that nothing in the Servicemembers Civil Relief Act would exempt a servicemember from the terms of the Hague Convention which only governs what is essentially a choice of laws and venue question. The petition will be granted.

### D. Costs and Fees

Sheree McCubbin has also filed a motion for attorney's fees and expenses [Doc. # 23]. The Court will wait to rule on the motion until Michael McCubbin has had an opportunity to respond.

### III. Conclusion

For the foregoing reasons, it is hereby

ORDERED that Sheree Linda McCubbin's Amended Petition for Return of Children [Doc. # 13] is GRANTED. It is further

ORDERED that Teagan and Braiden McCubbin are to be returned to Sheree McCubbin immediately for transportation back to Australia where a custody proceeding may be initiated by the parties. It is further

ORDERED that Michael McCubbin shall immediately return to Sheree McCubbin the children's passports and all necessary paperwork for their departure from the United States.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: June 28, 2006
Jefferson City, Missouri

13

Case 2:06-cv-04110-NKL   Document 24   Filed 06/28/06   Page 13 of 13